## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

CARLOS VÁZQUEZ-RIVERA,

    Plaintiff,

        v.                        CIVIL NO.: 12-1297 (MEL)

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

## OPINION AND ORDER

### I.   PROCEDURAL HISTORY

Carlos Vázquez Rivera ("plaintiff" or "claimant") was born in 1966 and has at least a high school education.  (Tr. 20).  Plaintiff worked as an operator at a silverware factory until August 2003 and then as a nurse at a hospital until September 2006.  (Tr. 81).  On May 3, 2007, plaintiff filed an application for Social Security disability benefits, alleging disability due to diabetes mellitus and depression.  (Tr. 15).  The alleged onset date of the disability was September 27, 2006, and the end of plaintiff's insurance period was March 31, 2012.  (Tr. 13, 15).  Plaintiff's application was denied initially and upon reconsideration.  Plaintiff made a timely request for a hearing, but waived his right to appear.  (Tr. 389).  He was represented by counsel at the hearing, which took place on February 23, 2010.  (Tr. 27).  A medical expert and a vocational expert provided testimony at the hearing.  The ALJ rendered a decision on April 22, 2010, denying plaintiff's claim.  (Tr. 21).  The Appeals Council denied plaintiff's request for review on March 6, 2012.  (Tr. 1).  Therefore, the ALJ's decision became the final decision of the Commissioner of Social Security (the "Commissioner" or "defendant").

On May 2, 2012, plaintiff filed a complaint seeking review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), alleging that it was not based on substantial evidence.  (D.E. 1). On September 6, 2012, defendant filed an answer to the complaint and a certified transcript of the administrative record.  (D.E. 8; 9).  Plaintiff has filed a memorandum of law (D.E. 16), but defendant has not.

## II.   LEGAL STANDARD

### A.    Standard of Review

Once the Commissioner has rendered his final determination on an application for disability benefits, a district court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing [that decision], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The court's review is limited to determining whether the ALJ employed the proper legal standards and whether his factual findings were founded upon sufficient evidence.  Specifically, the court "must examine the record and uphold a final decision of the Commissioner denying benefits, unless the decision is based on a faulty legal thesis or factual error."  López-Vargas v. Comm'r of Soc. Sec., 518 F. Supp. 2d 333, 335 (D.P.R. 2007) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam)).

Additionally, "[t]he findings of the Commissioner … as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).  The standard requires "'more than a mere scintilla of evidence but may be somewhat less than a preponderance' of the evidence." Ginsburg v. Richardson, 436 F.2d 1146, 1148 (3d Cir. 1971) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

While the Commissioner's fact findings are conclusive when they are supported by substantial evidence, they are "not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam) (citing Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) (per curiam); Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam)). Moreover, a determination of substantiality must be made based on the record as a whole. See Irlanda Ortiz, 955 F.2d at 769 (citing Rodríguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). However, "[i]t is the responsibility of the [ALJ] to determine issues of credibility and to draw inferences from the record evidence." Id. Therefore, the court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodríguez Pagán v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

**B.    Disability under the Social Security Act**

To establish entitlement to disability benefits, the claimant bears the burden of proving that he or she is disabled within the meaning of the Social Security Act. See Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 146–47 (1987). An individual is deemed to be disabled under the Social Security Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Claims for disability benefits are evaluated according a five-step sequential process. 20 C.F.R. § 404.1520; Barnhart v. Thomas, 540 U.S. 20, 24–25 (2003); Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999); Yuckert, 482 U.S. at 140–42. If it is determined that the claimant is not disabled at any step in the evaluation process, then the analysis will not proceed

3

to the next step.  At step one, it is determined whether the claimant is working and thus engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If so, then disability benefits are denied.  20 C.F.R. § 404.1520(b).  Step two requires the ALJ to determine whether the claimant has "a severe medically determinable physical or mental impairment" or severe combination of impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  If he does, then the ALJ determines at step three whether the claimant's impairment or impairments are equivalent to one of the impairments listed in 20 C.F.R. part 404, subpart P, appendix 1.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, then the claimant is conclusively found to be disabled.  20 C.F.R. § 404.1520(d).  If not, then the ALJ at step four assesses whether the claimant's impairment or impairments prevent him from doing the type of work he or she has done in the past.  20 C.F.R. § 404.1520(a)(4)(iv).  If the ALJ concludes that the claimant's impairment or impairments do prevent him from performing her past relevant work, the analysis then proceeds to step five.  At this final step, the ALJ evaluates whether the claimant's residual functional capacity ("RFC"),[1] combined with his age, education, and work experience, allows him to perform any other work that is available in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).  If the ALJ determines that there is work in the national economy that the claimant can perform, then disability benefits are denied.  20 C.F.R. § 404.1520(g).

Under steps one through four, the plaintiff has the burden of proving that he cannot return to his former job because of his impairment or combination of impairments.  Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989) (per curiam).  Once he has carried that burden, the Commissioner then has the burden under step five "to prove the existence of other jobs in the national economy that the plaintiff can perform."  Id.

---

[1] An individual's residual functional capacity is the most that he or she can do in a work setting despite the limitations imposed by her mental and physical impairments.  20 C.F.R. § 404.1545(a)(1).

### III.   RELEVANT MEDICAL EVIDENCE

#### A.   Physical Conditions

Between October 10 and 26, 2006, plaintiff was admitted to Hospital Metropolitano for osteomyelitis and an abscess on his right foot.  (Tr. 121–23, 478–79).  The discharge summary refers to plaintiff's history of diabetes mellitus.  A transmetatarsal amputation was performed on plaintiff's right big toe.  A debridement of the plantar abscess on plaintiff's right foot was also performed.

Plaintiff was hospitalized again between December 8 and 18, 2006, at Hospital de la Concepción as a result of edema in his right foot.  (Tr. 480–91).  He received a partial amputation of his right second toe.  A radiology report while plaintiff was hospitalized showed possible osteomyelitis.

Once again, plaintiff was hospitalized at Hospital de la Concepción between February 15 and 27, 2007, due to suppuration and inflammation in his right foot.  (Tr. 124–38, 492–504).  During this stay, plaintiff received another surgery on his right foot.  Between November 9, 2006, and March 15, 2007, plaintiff received thirty-seven physical therapy sessions at Hospital de la Concepción.  (Tr. 145, 509).  When plaintiff returned to Hospital de la Concepción's Outpatient Surgery Unit on May 17, 2007, he arrived in a wheelchair and exhibited edema on his right second toe.  (Tr. 139–49, 505–13).  Dr. Mario Figueroa-Díez, plaintiff's attending physician at Hospital de la Concepción, submitted a surgical report to the Social Security Administration on May 23, 2007, regarding plaintiff's amputations and osteomyelitis.  (Tr. 514–15; see Tr. 505).  He concluded that plaintiff would have difficulties with walking and standing.

On August 23, 2007, Dr. José A. Nieves Torres ("Dr. Nieves"), a consulting general surgery specialist, conducted a peripheral vascular evaluation of plaintiff.  (Tr. 150–51, 516–17).  Plaintiff's chief complaints were imbalance and difficulty walking.  At the examination, he was

walking with a cane.  Dr. Nieves noted that plaintiff had an open wound in his right foot that had not healed, occasional pain and numbness in both feet, hard edema and discoloration on the lower third of his right leg, devitalized and hypertrophic skin, and pain in the left inguinal area. During the examination, plaintiff was having difficulty getting on and off of the gurney. Dr. Nieves gave plaintiff a poor prognosis and recommended further evaluation, along with physical medicine and rehabilitation.[2]

Dr. Raymond I. Tossas Estrada ("Dr. Tossas"), a general practitioner, has been plaintiff's treating physician since at least October 3, 2005.  (Tr. 163–68, 204–91, 560–65, 616–17, 647–727).  Included in the medical record are a report dated February 28, 2008 ("first report"),[3] another dated December 8, 2009 ("second report"), and progress notes and other medical evidence between October 3, 2005, and February 25, 2010.  As of July 16, 2008, Dr. Tossas indicated that his treatment plan involved "[m]onthly reevaluation," "periodic reevaluation after surgery," and "[e]ndocrinology consultation."  (Tr. 163).  On the first report, plaintiff was diagnosed with diabetes mellitus and peripheral vascular disease.  On the second report, in addition to the previously mentioned conditions, plaintiff was diagnosed with diabetic polyneuropathy, hyperlipidemia, gastritis, and clinical depression, and it was noted that plaintiff's diabetes mellitus was insulin-dependent.

In both of the reports, Dr. Tossas observed symptoms of difficulty walking, infections or fevers, swelling, retinopathy, vascular disease or leg cramping, pain and numbness in an extremity, frequent urination, and dizziness or loss of balance.  (Tr. 164, 616).  Dr. Tossas also

---

[2] The ALJ also concluded that plaintiff was obese at the time of Dr. Nieves's evaluation.  (Tr. 17–18).  There is no direct medical conclusion that plaintiff is obese in the evaluation, although Dr. Nieves notes that plaintiff was 6'11" and weighed 241 pounds.  (Tr. 151).  Regardless, the ALJ did not determine that obesity was a severe impairment, and plaintiff does not contend that she should have reached that conclusion.

[3] Although Dr. Tossas's first report is dated February 28, 2008, it indicates that plaintiff's last visit had been on March 28, 2008.  (Compare Tr. 164 with Tr. 168).

noted sweating, headaches, edema, plantar abscess, tortuous superficial veins, acute ophthalmic neuropathy, altered tactile capability, blurred vision,[4] focal paresthesia, and neuropathic pain in the first report, and episodic vision blurriness, muscle weakness, a psychological problem, nausea or vomiting, diarrhea, and hyper- or hypoglycemic attacks in the second report.  (Tr. 164, 167, 616).  Dr. Tossas also indicated that plaintiff was experiencing clinical depression and anxiety.  (Tr. 165, 167, 617).  Plaintiff was experiencing "moderate severe pain" in his lower back, legs, and feet, (Tr. 164, 616); on December 8, 2009, he also had neck pain, (Tr. 616).  Almost every day, the pain would arrive in six- to eight-hour episodes.  (Tr. 164, 616).  Among the various precipitating factors were physical exertion, walking, standing, sitting, climate changes, glycemic changes, and direct pressure to the affected areas.  Dr. Tossas noted that plaintiff had been receiving various treatments, including diet, physical therapy, surgery, analgesics, antidepressants, and treatments to lower his glucose levels.   (Tr. 164, 617).  According to Dr. Tossas, plaintiff's symptoms would "frequently" or "constantly" be "severe enough to interfere with attention and concentration needed to perform even simple work tasks." (Tr. 165, 617).

In the first report, Dr. Tossas determined that plaintiff could walk less than one city block without rest or severe pain, sit for more than two hours at one time, and stand for twenty to thirty minutes at one time.  (Tr. 165).  Dr. Tossas appears to indicate that plaintiff could sit for at least six hours, but stand or walk for less than two hours, in a workday.[5]  According to Dr. Tossas, plaintiff would need to walk for ten to fifteen minutes every thirty to forty-five minutes.  (Tr.

---

[4] On December 12, 2007, a retinal surgery, which included scleral buckle, cryopexy, and intravitreal gas injection, was performed on plaintiff's right eye by an ophthalmologist.  (Tr. 281, 285, 719, 723).  Approximately two weeks later, plaintiff had shown "much improve[ment]."  (Tr. 285).  The ALJ did not conclude, however, that plaintiff had any vision problems as a severe impairment.  Plaintiff does not appear to contest this determination.
[5] In the first report, the lines for "about 2 hours," "about 4 hours," and "at least 6 hours" all contain checkmarks. (Tr. 165).

166).  Dr. Tossas concluded that plaintiff would require the use of a cane and a job permitting shifting positions at will and unscheduled breaks as frequently as two or three times per hour. Dr. Tossas also indicated that, with prolonged sitting, plaintiff's legs would need to be elevated to the chest level "possibly more than 3/4 of" an eight-hour workday.  (Tr. 166).  According to Dr. Tossas, plaintiff could only rarely lift even less than ten pounds at work, and never more than that.  Plaintiff could rarely crouch or squat, occasionally stoop or climb, and frequently twist. Plaintiff did not, however, have significant limitations with reaching, handling, or fingering.  (Tr. 167).  Regarding environmental restrictions, plaintiff would need to avoid even moderate exposure to extreme temperatures and concentrated exposures to high humidity, wetness, cigarette smoke, soldering fluxes, solvents or cleaners, fumes, odors, gases, dust, and chemicals. Dr. Tossas anticipated that plaintiff would need to miss more than four days per month as a result of his impairments or treatment.  In the second report, Dr. Tossas indicated that, between February 28, 2008, and December 8, 2009, plaintiff's "glycemic discontrol is more evident now."  (Tr. 617).  Plaintiff's prognosis was determined to be poor.  (Tr. 164, 616).

Dr. Samuel Méndez ("Dr. Méndez") conducted a consultative neurological evaluation on October 29, 2007.  (Tr. 522–29).  Plaintiff indicated that he had been experiencing lower back pain since May 2007.  Dr. Méndez determined that plaintiff had chronic lumbalgia and lumbosacral syndrome.  He also observed that plaintiff was assisted by a cane but was not dependent on it, as plaintiff had no foot drop or limping.

Dr. Idalia Pedroza ("Dr. Pedroza"), a state agency medical expert, completed a physical RFC assessment on November 26, 2007.  (Tr. 530–39).  Dr. Pedroza determined that, given plaintiff's toe amputations and osteomyelitis, he could lift a maximum of fifty pounds

occasionally and twenty-five pounds frequently.  Dr. Pedroza concluded that plaintiff had no other physical limitations.

Dr. Alfredo Pérez Canabal ("Dr. Pérez") conducted a consultative neurological evaluation on August 4, 2008.  (Tr. 566–76).  He observed that plaintiff had "severe burning sensation and numbness in both legs and feet."  (Tr. 566).  Dr. Pérez concluded that plaintiff had "a severe motor sensory neuropathy," a lack of balance, and difficulty with his gait, as it was protecting his right leg.  (Tr. 566, 568, 571).  At the time, however, plaintiff was not using a cane and Dr. Pérez determined that he did not need one.

At the hearing held on February 23, 2010, Dr. Osvaldo Fulco ("Dr. Fulco"), an internal medicine specialist, testified as a medical expert.  (Tr. 38–42; see Tr. 19).  Dr. Fulco determined that, due to complications pertaining to diabetes, plaintiff was limited to lifting twenty pounds occasionally and ten pounds frequently, standing or walking for thirty minutes at a time and ninety minutes in a workday, and sitting for six hours.  He also testified that plaintiff could not climb stairs or use foot controls.  Dr. Fulco indicated that he agreed with Dr. Tossas's statement that plaintiff "should maintain his legs elevated because he has had edemas on his legs."  (Tr. 42).  If plaintiff sat for more than two hours at a time, Dr. Fulco testified that he would have to keep his feet elevated.  Based on these limitations identified by Dr. Fulco, Dr. Ariel Cintrón ("Dr. Cintrón"), who testified at the hearing as a vocational expert, indicated that plaintiff would not be able to perform either his previous occupations or any other job in the national economy.  (Tr. 42–47).

### B.    Mental Conditions

On May 12, 2008,[6] plaintiff was evaluated at ROVICO Behavior Care and Treatment Clinic ("ROVICO") for the Puerto Rico Mental Health and Anti-Addiction Services Administration because of his complaints of depressed feelings, irritability, sleeplessness, thoughts of despair, poor concentration, and poor short-term memory.  (Tr. 152–62, 545–55, 623–27).  Plaintiff, however, received no diagnosis.[7]

Dr. Alberto Rodríguez Robles ("Dr. Rodríguez") conducted a consultative psychiatric evaluation on August 19, 2008.  (Tr. 169–73, 577–81).  While plaintiff had restricted affect, depressed mood, slow thought process, and diminished attention and concentration, he also had fair insight, adequate judgment, and full orientation.  Dr. Rodríguez diagnosed plaintiff with major depressive disorder (single episode, severe without psychotic features),[8] gave him a poor prognosis, and indicated that he could not handle funds.[9]

Dr. E. Charles ("Dr. Charles"), a state agency psychiatrist, completed a psychiatric review technique and a mental RFC assessment on September 22, 2008.  (Tr. 585–607).  Dr. Charles determined that plaintiff had a depressive disorder and was experiencing symptoms of depression, social and emotional withdrawal and isolation, poor self-esteem, depressed mood, constricted affect, and deficits in attention and concentration.  Nonetheless, Dr. Charles

---

[6] At different points, the translation indicates that the date was either "06/12/08" or "May 12, 2008."  (Compare Tr. 152 with Tr. 162).  The original page on which the transcription of "06/12/08" was based, however, appears to be ambiguous as to whether the month numeral is a six or a five.  (See Tr. 545).

[7] The code "799.9," which plaintiff received on Axis II, (Tr. 156), indicates "Diagnosis Deferred on This Axis." Acosta v. Astrue, 865 F. Supp. 2d 767, 784 (W.D. Tex. 2012).

[8] Dr. Rodríguez indicated that plaintiff's diagnosis was "296.23," which "refers to Major Depressive Disorder: Single Episode, Severe Without Psychotic Features."  Meléndez-Ojeda v. Comm'r of Soc. Sec., Civ. No. 11-1485 (CVR), 2012 WL 5199609, at *7 n.3 (D.P.R. Oct. 22, 2012).

[9] Although the English translation indicates that "[t]he claimant is qualified to handle his funds," (Tr. 172), it appears to be a mistranslation, as the ALJ states that Dr. Rodríguez "opined that the claimant was unable to handle funds," (Tr. 19; see Tr. 580 ("El reclamante no se encuentra capacitado para manejar sus fondos.")).

concluded that, because plaintiff was able to take care of his personal needs, perform house chores, and drive short distances, his mental abilities for simple tasks were not impeded.

On December 9, 2008, plaintiff was diagnosed with major depressive disorder (single episode, moderate)[10] and a mood disorder at ROVICO.  (Tr. 177–78, 621–22).  He carried a cane and was found to have slowed motor activity and depressed mood.  Nevertheless, he had a logical, coherent, and relevant thought process, full orientation, preserved memory, and good judgment and insight.  He was prescribed with Prozac and Trazodone.  The medical record also includes progress notes from ROVICO for three sessions between February 9 and October 14, 2009, which also contain plaintiff's diagnosis of major depressive disorder and prescriptions for Prozac and Trazodone.  (Tr. 174–83, 618–27).

IV.   ANALYSIS

A.   **Medical Expert**

In this case, the ALJ concluded at step five that the Commissioner met his burden of showing that there were jobs in the national economy that plaintiff could perform despite his severe impairments of diabetes mellitus and major depression.  In coming to this conclusion, the ALJ assigned "[l]ittle credibility" to Dr. Fulco's testimony because he "relied mainly" on Dr. Tossas's reports, which "were not supported by treatment notes at the time of the hearing." (Tr. 19).

Plaintiff argues, however, that this determination was erroneous under Soto-Cedeño v. Astrue, 380 F. App'x 1 (1st Cir. 2010).  In Soto-Cedeño, the ALJ rejected the opinion of the treating psychiatrist "in part because no supporting treatment notes were attached to his … report and RFC assessment."  380 F. App'x at 3.  The First Circuit concluded that "the absence of

---

[10] Plaintiff's diagnosis of "296.22" refers to "Major Depressive Disorder, Single Episode, Moderate."  Balis v. Astrue, No. 2:10-CV-01304, 2011 WL 7645817, at *10 (S.D.W. Va. Nov. 22, 2011), report and recommendation adopted, 2012 WL 1111389 (S.D.W. Va. Mar. 30, 2012).

11

treatment notes does not justify the rejection of [the treating psychiatrist]'s opinion" because the report which was submitted "explained the basis for his opinion." Id. Specifically, the report "described his observations of [plaintiff] and the results of specific memory tests he had administered to her at her most recent appointment ...." Id. Thus, the court held that "the absence of treatment notes alone did not show that [the treating psychiatrist]'s opinion was not 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.'" Id.

Although the circumstances of the instant case are not identical to those in Soto-Cedeño, the reasoning is nonetheless applicable here.[11] If Dr. Tossas's reports explain the basis for his medical opinion, rather than merely stating his conclusions without any support or explanation, then Dr. Fulco appropriately relied on said documents.

As an initial matter, the ALJ did not indicate that Dr. Tossas failed to explain the basis for his opinion in his reports; she rather stated that they did not include treatment notes. Moreover, from an examination of the first report, the report cited by Dr. Fulco,[12] it is clear that Dr. Tossas did lay an adequate foundation for his conclusions. In the first report, Dr. Tossas listed numerous symptoms that plaintiff was experiencing, including, for example, difficulty walking, infections or fevers, swelling, pain and numbness in his leg, and loss of balance. (Tr. 164). Dr. Tossas also observed that plaintiff had edema, plantar abscess, neuropathic pain, and feelings of depression and anxiety. (Tr. 164–65, 167). Additionally, Dr. Tossas described the nature of the pain plaintiff was experiencing as moderately severe pain in his lower back, legs, and feet, occurring almost daily in six- to eight-hour-long episodes, and involving precipitating

---

[11] Unlike Soto-Cedeño, Dr. Tossas's treatment notes were submitted before the ALJ reached her decision in this case. As such, the ALJ ultimately did consider said treatment notes. Nonetheless, the ALJ chose not to give credibility to Dr. Fulco's testimony from the hearing because he had not had access to said treatment notes at the time.

[12] Dr. Fulco specifically refers to "document 15F," which is the exhibit number for Dr. Tossas's first report. (Tr. 39). Moreover, Dr. Tossas's conclusion that plaintiff should keep his legs elevated is mentioned in the first report, (Tr. 166), not in the second one.

factors such as physical exertion, glycemic changes, and direct pressure.  (Tr. 164).  Dr. Tossas diagnosed plaintiff with diabetes mellitus and peripheral vascular disease, ultimately concluding that he had a poor prognosis.  Id.  He also listed the various treatments plaintiff had been placed on for his conditions, including diet, physical therapy, surgery, and glycemic treatments.  Id. Because of these symptoms, observations, and diagnoses, Dr. Tossas arrived at his conclusions regarding plaintiff's limitations on walking, sitting, and standing, including his need to keep his legs elevated while sitting.  (Tr. 165–67).  Thus, because Dr. Tossas provided the basis for his determinations in his first report, the ALJ did not adequately explain the reduced weight given to Dr. Fulco's testimony.  See 20 C.F.R. § 404.1527(e)(2)(ii) (indicating that an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us").

Furthermore, it is not readily apparent that Dr. Fulco "relied mainly" on Dr. Tossas's reports.  (Tr. 19).  Dr. Fulco indeed stated that he was "in agreement with" Dr. Tossas's conclusion that plaintiff "should maintain his legs elevated because he has had edemas on his legs," characterized Dr. Tossas's first report as "a believable evaluation," and indicated that he was "in agreement with this evaluation."  (Tr. 40, 42).  Dr. Fulco, however, also stated that Dr. Tossas's first report was "a believable evaluation" because "the medical evidence shows that the claimant has difficulty standing and walking because of his diabetic condition and the loss of sensation on his feet."  (Tr. 40).  Additionally, Dr. Fulco referred to Dr. Tossas's observations that plaintiff had a plantar abscess and "changes on his skin of his right leg, with edema and discoloration."  Id.  In other words, Dr. Fulco appears to have agreed with Dr. Tossas's report not

due to blind reliance on his conclusions, but because of his particular findings and their consistency with the rest of the medical record.

An analysis of Dr. Fulco's entire answer supports this understanding of his testimony. Only after discussing plaintiff's diagnosis of diabetes, his complaints beginning in 2006, infection in his right foot, treatments and amputations at Hospital Metropolitano and Hospital de la Concepción, Dr. Nieves's determination that there was no vascular illness, Dr. Pérez's evaluation of plaintiff's severe neuropathy, plaintiff's burning sensation and numbness in the feet, difficulty with walking, and "superficial sensation … of the lower extremity illness," and a description of the nature of diabetic neuropathy, (Tr. 38–39), does Dr. Fulco even refer to Dr. Tossas's conclusions regarding plaintiff's limitations in walking or standing.  As such, it is clear that Dr. Fulco reviewed the entire medical record—including the observations included in Dr. Tossas's reports—not just Dr. Tossas's conclusions.

### B.      Treating Physician

Plaintiff also argues that the ALJ's decision to give little weight to the opinions of Dr. Tossas, his treating physician, was not supported by substantial evidence.  As discussed above, Dr. Tossas provided treatment notes in support of his reports after the hearing was held. (Tr. 204–91, 647–727).  Nonetheless, the ALJ chose to discount Dr. Tossas's opinions because "these records … do not support such a debilitating assessment as noted in the reports" and "include referrals from other physicians who indicated a more improved condition."  (Tr. 18).

The disability determination process generally accords "more weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative

examinations or brief hospitalizations."[13]   20 C.F.R. § 404.1527(c)(2).   As such, "a treating source's opinion on the question of the severity of an impairment will be given controlling weight so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'"   Polanco-Quiñones v. Astrue, 477 F. App'x 745, 746 (1st Cir. 2012) (quoting 20 C.F.R. § 404.1527(c)(2)). To this end, "an ALJ *must* give 'good reasons' for the weight accorded to a treating source's opinion."   Id. (quoting 20 C.F.R. § 404.1527(c)(2)) (emphasis in original).

In Polanco-Quiñones, the ALJ had asserted that "the opinions of [the treating physician] were inconsistent with other substantial evidence in the record."   477 F. App'x at 748.   This was problematic because "the ALJ gave absolutely no reasons for his conclusion that [the treating physician's] opinions were not well-supported."   Id. at 746.   Similarly, the ALJ in this case simply asserts that Dr. Tossas's conclusions are unsupported by his treatment notes and inconsistent with other physicians' opinions, without citing to any evidence from the record in support of her finding.   The ALJ has presented no specific example of an instance where Dr. Tossas's treatment notes conveyed that plaintiff was in a better condition than his reports indicated.   The ALJ did not specify which physicians' opinions undermined Dr. Tossas's reports. Without citing to particular examples or providing additional explanation, statements that a treating physician's notes "do not support such a debilitating assessment as noted in the reports" and "include referrals from other physicians who indicated a more improved condition," (Tr. 18), do not constitute good reasons to accord reduced weight to a treating source's opinion.   See Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004) ("When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its [*sic*] reasons.").   Nor has the

---

[13] Similarly, the Commissioner should "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]."   20 C.F.R. § 404.1527(c)(1).

Commissioner placed the court in a position to determine that "the ALJ's conclusion … is mandated by the record evidence," as plaintiff's memorandum of law stands unopposed.[14]

### C.    Vocational Expert

Another argument raised by plaintiff is that the existence of nonexertional limitations prohibits exclusive reliance on the Medical-Vocational Guidelines ("the Grid"), 20 C.F.R. pt. 404, subpt. P, app. 2.  (D.E. 16, at 22–23).  The purpose of the Grid is to assist the Commissioner in determining "the existence of other jobs in the national economy that the claimant can perform … in a streamlined fashion without resorting to the live testimony of vocational experts."  Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989).  Based on "data reflecting major functional and vocational patterns," the Grid directs a finding of "disabled" or "not disabled" based on the combination of the claimant's physical RFC (light work, medium work, heavy work, or very heavy work) and vocational factors (age, education, and work experience).  20 C.F.R. § 404.1569; 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(a).  The Grid takes into account only "limitations in meeting the strength requirements of jobs" ("exertional limitations").  Id.

Here, at step five of the disability analysis, the ALJ determined that, "[b]ased on a residual functional capacity for the full range of medium work, considering the claimant's age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 203.29 and Rule 203.22."  (Tr. 21).  The ALJ came to this conclusion after her decision to accord less weight to the opinions of Dr. Fulco and Dr. Tossas.  (Tr. 18–19).  As discussed

---

[14] Typically, the court is "not … permitted to affirm agency action on grounds other than those advanced by the agency."  Polanco-Quiñones, 477 F. App'x at 746.  Nevertheless, there is an "exception for situations where it is clear what the agency's decision must be."  Id.  In such a case, the relevant question would be "whether, for the reasons given by the Commissioner, the ALJ's conclusion that [the treating physician's] reports were not well-supported is mandated by the record evidence."  Id.  In Polanco-Quiñones, the court determined that the Commissioner's proffered reasons were inadequate.  In this case, however, because the Commissioner has not filed a memorandum, he has not provided any reason to conclude that the ALJ's conclusion is mandated by the record evidence.

above, however, there was not substantial evidence to support this determination.  Both Dr. Tossas and Dr. Fulco concluded that plaintiff had the nonexertional limitation of needing to elevate his legs at work.[15]

In cases involving "mixed exertional/nonexertional limitations," such as this one, the First Circuit "ha[s] cautioned against the mechanical application of the Grid."  Vázquez-Rosario v. Barnhart, 149 F. App'x 8, 10 (1st Cir. 2005).  When a claimant exhibits a nonexertional impairment, and the Grid does not direct a finding of disability, the Grid should merely be used "as a framework" to determine the extent "the individual's work capability is further diminished" by the nonexertional impairment.  20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(e)(2).  Similarly, "the regulations recognize that the rules in the Medical-Vocational Guidelines 'may not be fully applicable' where limitations in lieu of strength impairments are asserted."  Gagnon v. Sec'y of Health & Human Servs., 666 F.2d 662, 665 (1st Cir. 1981) (quoting 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(e)).  Specifically, the regulations note that, because "the rules are predicated on an individual's having an impairment which manifests itself by limitations in meeting the strength requirements of jobs, they may not be fully applicable where the nature of an individual's impairment does not result in such limitations …."  20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(e).  Impairments which may not be subject to the Grid might include "mental, sensory, or skin impairments," or impairments which "result solely in postural and manipulative limitations or environmental restrictions."  Id.  Thus, when "a non-exertional impairment 'significantly affects claimant's ability to perform the full range of jobs' he is otherwise

---

[15] According to the regulations, nonexertional limitations may include "(i) … difficulty functioning because [one is] nervous, anxious, or depressed; (ii) … difficulty maintaining attention or concentrating; (iii) … difficulty understanding or remembering detailed instructions; (iv) … difficulty in seeing or hearing; (v) … difficulty tolerating some physical feature(s) of certain work settings, e.g., [one] cannot tolerate dust or fumes; or (vi) … difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching."  20 C.F.R. § 404.1569a(c)(1).

exertionally capable of performing," the Commissioner must carry his burden "typically through the use of a vocational expert." Ortiz, 890 F.2d at 524 (quoting Lugo v. Sec'y of Health & Human Servs., 794 F.2d 14, 17 (1st Cir. 1986)).[16]

Here, however, the ALJ did request the testimony of a vocational expert. At the hearing, Dr. Cintrón determined that plaintiff could not perform previous work or any other job in the national economy. (Tr. 42–47). Dr. Cintrón testified that these conclusions were "based primarily" on plaintiff's nonexertional limitation of needing "to have his legs elevated, after sitting for two hours." (Tr. 46). Thus, at step five, the Commissioner failed to meet his burden of proving that there were jobs in the national economy that plaintiff is capable of performing.[17]

## V.   CONCLUSION

Based on the foregoing, the decision of the Commissioner is hereby **REVERSED** and the case is **REMANDED** for further proceedings not inconsistent with this opinion and order.[18]

---

[16] There is an exception to the rule against exclusive reliance on the Grid in cases involving nonexertional limitations. If the nonexertional impairments "have only a slight effect on the availability of work"—thus "reducing th[e] occupational base marginally"—"the Grid … can be relied on exclusively.'" Román-Román v. Comm'r of Soc. Sec., 114 F. App'x 410, 411 (1st Cir. 2004) (quoting Ortiz, 890 F.2d at 524). Even in cases involving such a "shorthand approach," the First Circuit "caution[s] that an ALJ typically should err on the side of taking vocational evidence when [a significant nonexertional] limitation is present." Ortiz, 890 F.2d at 528. Here, the ALJ determined that major depression was one of plaintiff's severe impairments and that this condition "limit[ed] the claimant to the performance of simple repetitive tasks from December 2008 on." (Tr. 15). Under this determination, it appears that the ALJ was indicating that plaintiff remained able to perform unskilled work. See Social Security Ruling 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985) (indicating that "the mental demands of … unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions"). Because upon remand the Commissioner must first reconsider or explain with greater detail the weight accorded to the treating physician and the medical expert—an analysis involving the nonexertional limitation allegedly requiring plaintiff to elevate his legs at work—it is unnecessary to determine whether, in the absence of said nonexertional limitation, the ALJ was permitted to rely exclusively on the Grid rather than presenting the nonexertional limitation of major depression to a vocational expert.

[17] Plaintiff also argues that the hypothetical presented to the vocational expert did not incorporate other nonexertional limitations, such as his slowed motor activity, slowed flow of thought, and reduced attention and concentration. (Tr. 22–23). It is unnecessary to determine whether plaintiff's argument is correct because, although it is typically true that "in order for a vocational expert's answer to a hypothetical question to be relevant" an ALJ must "accurately transmit" a claimant's limitations "to the expert in the form of assumptions," Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982), Dr. Cintrón already concluded that there were no jobs in the national economy that plaintiff could perform. (Tr. 46).

[18] Because the aforementioned analysis is sufficient to conclude that there was not substantial evidence to support the ALJ's finding of no disability, it is unnecessary to address plaintiff's arguments that the Dr. Tossas's progress notes constituted "very raw medical evidence" which the ALJ was not permitted to assess without the assistance of a

Upon remand, the Commissioner shall reevaluate the weight given to the findings and opinions of Dr. Tossas and Dr. Fulco and explain with more specificity the reasons for assigning such weight.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 7th day of May, 2013.

s/Marcos E. López<br>
U.S. Magistrate Judge

---

medical expert, (D.E. 16, at 19), that the state agency doctors failed to give specific reasons for their opinions or consider plaintiff's "severe case of neuropathy," id. at 28, and that the Social Security field officer noted that plaintiff arrived in a wheelchair accompanied by his wife and had "obvious limitations in walking and standing," (Tr. 405).